AT & T INFORMATION
SYSTEMS, INC.

v.

LOCAL 13000 COMMUNICATIONS
WORKERS OF AMERICA,
AFL–CIO.

Civ. A. No. 83–2620.

United States District Court,
E.D. Pennsylvania.

May 14, 1985.

Francis M. Milone, Jesse Milan, Jr., Philadelphia, Pa., for plaintiff.

Richard H. Markowitz, Robert C. Cohen, Philadelphia, Pa., for defendant.

MEMORANDUM AND ORDER

FULLAM, Chief Judge.

In combination, orders of the Federal Communications Commission and a consent

degree in a government antitrust suit made it necessary for AT & T (1) to separate its regulated ("operating") businesses from its unregulated ("customer premises equipment" and "enhanced services") businesses, and (2) to divest itself of certain aspects of its businesses. The reorganization which followed these determinations had ramifications for the labor unions representing employees of AT & T and its many subsidiaries and affiliated companies. At issue in the present case is the extent to which plaintiff, one of the new subsidiaries of AT & T which was formed as a part of the reorganization, is bound by a collective bargaining agreement between the defendant union and Bell of Pennsylvania, formerly a subsidiary of AT & T but now completely divested.

In 1980, Bell of Pennsylvania entered into a collective bargaining agreement with the defendant union, which was then affiliated with the Telecommunications International Union ("TIU"). At that time, Bell of Pennsylvania owned and operated certain "telephone stores", which sold and installed "customer premises equipment"; employees represented by the defendant union were involved in that kind of work.

In 1982, AT & T required Bell of Pennsylvania (its wholly owned subsidiary) to dispose of some of its its "telephone stores" by conveying them to the plaintiff, a newly created, wholly owned subsidiary of AT & T. The transfer of assets was to be completed and effective as of January 1, 1983, the date when plaintiff commenced operations. At that time, however, no employees represented by the defendant union were transferred from Bell of Pennsylvania to the plaintiff, but it was understood that, eventually, at a later stage of the divestiture program, many of the Bell of Pennsylvania employees represented by the defendant would be transferred to plaintiff's employ. It was also understood by all concerned that, as of the date of complete divestiture, Bell of Pennsylvania would no longer be a wholly owned subsidiary of AT & T. The date of complete divestiture, and the date when the Bell employees represented by the defendant

union were transferred to the plaintiff's employ, was in January 1984, approximately one year after the transfer of assets comprising the "telephone stores".

In anticipation of these transactions, and many other similar transactions involving other subsidiaries and other parts of the country, AT & T, its operating subsidiaries, and the three international unions which represented the employees of these firms (TIU), the International Brotherhood of Electrical Workers ("IBEW") and Communications Workers of America ("CWA") negotiated agreements concerning the collective-bargaining consequences of the forthcoming re-shuffles. Identical memoranda of agreement were entered into with each of the three international unions by AT & T, for itself and on behalf of all of its subsidiaries and affiliates, in August 1980. These agreements were modified in 1982. By the time of the 1982 modifications, the defendant union was no longer affiliated with any of the three national unions which were signatories to the memoranda of understanding, and there was some uncertainty as to whether the defendant union and its members were protected thereby. Accordingly, it was deemed advisable to negotiate a similar "memorandum of understanding" between Bell of Pennsylvania and the defendant local union.

It is clear that the overall purpose of the parties to these negotiations was to enable the defendant and its members to avail themselves of essentially the same protections provided by the national agreements. It is also clear, and undisputed, that the 1982 agreement which resulted from these negotiations was drafted entirely by Bell of Pennsylania and AT & T, acting in concert. No drafts were submitted by the union, nor were any changes in wording suggested by the union.

The 1982 agreement between Bell of Pennsylvania and the defendant union differs from the three "national" agreements between AT & T and the national unions, in two respects which the parties deem relevant to this case (although, needless to say,

the parties disagree sharply as to the significance of these differences): (1) paragraph 12 of the three national agreements contains a phrase which does not appear in the corresponding paragraph of the agreement with the defendant local union; and (2) the agreement with the defendant local includes an additional paragraph, No. 13, not contained in the three national agreements.

Paragraph 12 of the three national agreements provides:

"12. Each Bell System company will continue to be bound by the terms and conditions of [the specified collective bargaining agreement(s)] which is in existence at the time of any divestiture from AT & T. In addition, each wholly owned Bell System company agrees that the terms and conditions of such an agreement shall be fully binding on any successor organization *to which employees covered hereby are transferred* and that it will secure as a condition of any sale or other transfer of ownership of all or part of its business and physical assets, the assent of any successor organization that such agreement shall continue to effect and bind the successor organization." [Emphasis supplied]

In the agreement with the defendant local, the underlined words "to which employees covered hereby are transferred" are omitted. (In addition, of course, the words "Bell of Pennsylvania" are substituted for "each Bell System company".)

And the agreement with the defendant local union includes the following additional paragraph:

"13. Bell of Pennsylvania will seek to obtain concurrence in this memorandum of agreement by American Telephone & Telegraph Company (AT & T) to the extent that employees covered by this agreement who are transferred to an AT & T organization as herein defined or to a new subsidiary or affiliate entity of AT & T shall receive the same treatment from such AT & T organization, new subsidiary or affiliate entity of AT & T as if they transferred to a new subsidi-

ary or affiliate of Bell of Pennsylvania pursuant to this agreement...."

The agreement with the defendant local union was submitted to the Executive Board of the defendant union, and was duly signed by the appropriate official, and dated as of June 2, 1982. In due course, under date of June 17, 1982, the appropriate official of AT & T expressed that company's "concurrence" as follows:

"... American Telephone & Telegraph Company (AT & T) concurs in the Bell of Pennsylvania—FTWP memorandum of agreement to the extent that employees covered by that agreement who are transferred to an AT & T organization or new subsidiary or affiliate entity of AT & T as therein defined, shall receive the same treatment from such AT & T organization or new subsidiary or affiliate entity of AT & T as provided by the Bell of Pennsylvania-FTWP memorandum of agreement for employees transferred to a subsidiary or affiliate of Bell of Pennsylvania."

A principal question now before the court is the applicability of the 1980 collective bargaining agreement between Bell of Pennsylvania and the defendant union to certain activities of the plaintiff which occurred in 1983, after Bell's telephone stores were transferred to plaintiff, but before the transfer of covered employees.

## I. PROCEDURAL BACKGROUND

The 1980 collective bargaining agreement between Bell of Pennsylvania and the defendant union provided, in Article 17.01, that "the Company will maintain its established policies as to the assignment of work in connection with the installation and maintenance of communications facilities owned, maintained and operated by the company." The defendant local union contended that, in its operation of the telephone stores during 1983, plaintiff deviated from the customary work assignment policies, in violation of that provision of the collective bargaining agreement, and demanded arbitration of the disputes. The company thereupon filed this lawsuit, seek-

ing a declaratory judgment that plaintiff was not bound by the collective bargaining agreement, and seeking an injunction against the scheduled arbitrations. On October 12, 1983, at the conclusion of a brief evidentiary hearing, I ruled from the bench that plaintiff was bound by the collective bargaining agreement, and was required to submit the disputes to arbitration pursuant to that agreement. The gist of my ruling was that ¶ 12 of the 1982 memorandum of understanding plainly obligated Bell of Pennsylvania to see to it that plaintiff, as the transferee of a significant part of Bell's business, agreed to be bound by the collective bargaining agreement; that, in the circumstances (in which AT & T, as the parent of both Bell of Pennsylvania and plaintiff, was in total control of the situation), plaintiff was chargeable with knowledge of Bell's obligation to obtain its assumption of the collective bargaining agreement; and that "equity regards as done that which ought to have been done".

Plaintiff appealed my ruling to the Court of Appeals for the Third Circuit, but its application for a stay of my Order pending appeal was denied both by this court and by the Court of Appeals. Accordingly, while the appeal was pending, the parties were proceeding with the arbitration hearings.

On June 6, 1984, the Court of Appeals, by divided vote, vacated my October 12, 1983 Order and remanded the case for further proceedings.[1] The panel majority ruled that plaintiff would be bound by the collective bargaining agreement only if (1) it was a "successor" within the meaning of ¶ 12 of the memorandum of understanding (but the court felt itself unable to review my ruling in that respect "without an adequate record and articulation of factual findings"); or (2) it were permissible to pierce the corporate veil, or apply some similar doctrine (but, before deciding that issue, a more complete evidentiary record, and more specific discussion by the district court, would be required).

By the time the Court of Appeals' mandate was received, the arbitration hearings had concluded, and the arbitrators had rendered decisions (generally favorable to the union) in two of the three pending grievances. Plaintiff thereupon sought leave to amend its Complaint, and the amendment was permitted, as of November 16, 1984. The Amended Complaint seeks declaratory relief, injunctive relief against further arbitration proceedings, and an order vacating the arbitration awards. A non-jury trial was held January 9, 1985. The parties have now submitted their requests for findings of fact and conclusions of law, together with additional briefs, and the case is now ripe for final disposition. In the course of decision, I am required to re-examine my earlier findings and conclusions concerning the applicability of the collective bargaining agreement, and to provide a more complete and detailed articulation of my reasoning; and I am also required to address, both procedurally and substantively, the decisions of the arbitrators, if the disputes were indeed arbitrable.

## II. IS PLAINTIFF BOUND BY THE COLLECTIVE BARGAINING AGREEMENT?

Plaintiff is not a signatory to the collective bargaining agreement between the defendant local union and bell of Pennsylvania. Plaintiff is bound by that collective bargaining agreement only if it agreed to become bound by it (*i.e.,* objectively manifested an intent and agreement to do so), or if, regardless of its intent, it is legally obligated to assume that agreement. In my view, plaintiff is bound by the collective bargaining agreement, under either or both of these theories.

### A. *Express Agreement*

 The language of the pertinent memorandum of understanding could scarcely be clearer:

"In addition, Bell of Pennsylvania agrees that it will secure as a condition of any sale or other voluntary transfer of

---

**1.** *American Bell, Inc. v. Federation of Tel. Work-* *ers,* 736 F.2d 879 (3d Cir.1984).

ownership of all or part of its business and physical assets, the assent of any successor organization that the collective bargaining agreement between it and [defendant union] shall continue in effect and bind the successor organization."

In this context, it is clear that the parties were using the term "successor organization" to designate any transferee "of ownership of all or part of [Bell's] business and physical assets." That is, if Bell of Pennsylvania was going to transfer part of its business to some other entity which would thereafter conduct that portion of the business, Bell was obliged to see to it that the transferee agreed to be bound by the collective bargaining agreement.

The term "successor organization" was not being used as a term of art in the labor-law sense. Moreover, it seems clear that if the transfer of assets had been accompanied by a more or less simultaneous transfer of a significant part of Bell's work force, plaintiff would qualify as a "successor" even in the technical sense. It is now clear on the record (as it was not, at the time of the October 1983 hearing and the Court of Appeals' ruling) that when the assets were transferred in 1983, everyone understood that it would be followed by the transfer of a large number of employees covered by the collective bargaining agreement.

Plaintiff argues that it was the intention of the parties that the term "successor organization" be modified by the phrase "to which employees covered hereby are transferred", and that this modifying phrase was inadvertently omitted from the Bell of Pennsylvania memorandum of understanding, although it was included in all of the three national agreements which the parties intended to copy. I reject that contention, for several reasons.

In the first place, the only entity which had the authority to bind the defendant union to the memorandum of understanding was its executive board. It is undisputed that the only version of the memorandum of understanding which was ever submitted to or considered by the ex-

ecutive board is the document which was signed. That document did not include the modifying phrase. There is simply no basis in this record for binding the defendant union to any such modification.

In the second place, the union official who negotiated the memorandum of understanding is now deceased, having died in April of 1984. The contention that the modifying phrase was inadvertently omitted, as a result of transcription error, was never advanced by the plaintiff during the lifetime of that union representative. Specifically, plaintiff never suggested any such transcription error in the course of the 1983 hearing, or in the course of any of the arbitration hearings or proceedings.

In the third place, the testimony relied upon to establish the alleged transcription error was singularly unpersuasive. Plaintiff called as a witness the attorney in the legal department of Bell of Pennsylvania who participated in the drafting of the memorandum of understanding. Testifying, at first, without having the pertinent documents at hand, he explained that the phrase had been omitted through transcriber's error, and asserted that he arrived at that conclusion because (1) the national agreements were being used as a model, to be copied verbatim as much as possible, and (2) it was easy to reconstruct the transcriber's error—the typist must have inadvertently skipped from one "that" to another, omitting one of the clauses. When confronted with the actual documents, however, the witness was forced to recede from that position. It is obvious that the suggestion that the typist omitted language between two "thats" simply does not fit with the facts. Moreover, the language now in question—the provisions relating to transfers of business and physical assets—are identical in all four agreements, as discussed below.

It should be noted also that, while plaintiff introduced in evidence certain handwritten notes of the Bell official who negotiated the memorandum of agreement (the notes shed no significant light on the precise issue now under discussion), plaintiff

did not present any evidence concerning earlier drafts of the memorandum of understanding, inter-office memos or any similar documentation. When defendant's counsel sought to obtain production of earlier drafts of the memorandum of understanding from Bell of Pennsylvania, in pre-trial discovery, the application was resisted on grounds of the attorney-client privilege. While it is true that Bell of Pennsylvania and the plaintiff are now no longer part of the same corporate family, plaintiff had no difficulty in presenting at trial the testimony of the Bell lawyer who drafted the memorandum of understanding, and it seems obvious that plaintiff could have produced earlier drafts, or explained their non-production. Plaintiff did neither. Plaintiff's counsel seeks to avoid the adverse inference which would naturally arise in these circumstances, by asserting that the defendant union should have sought judicial aid to compel Bell of Pennsylvania to produce the earlier drafts of the memorandum of understanding. I disagree. Plaintiff is the party trying to establish the alleged error in the only agreement signed by the parties.

Finally, the differences between the Bell of Pennsylvania memorandum of understanding and the three national memoranda are entirely consistent with the differences in the circumstances of the parties to the respective agreements. Plaintiff concedes, and it is borne out by the handwritten notes of Bell's negotiator, and by the testimony of the Bell attorney-draftsman, that the reason the parties could not simply copy verbatim the three national agreements was that the parties realized that Bell of Pennsylvania (a) would soon be required to transfer portions of its business to other entities, (b) would soon be transferring many of its employees to other entities, and (c) would soon cease to be affiliated in any way with AT & T or any AT & T subsidiary. The three national agreements were signed by AT & T, on behalf of all of its subsidiaries and affiliates. AT & T would therefore be responsible for carrying out the terms of the national agreements. Therefore, Bell of Pennsylvania needed to make certain that it could not be held liable, under the memorandum of understanding, for future conduct by other entities over which it would have no control.

It is clear that the drafting of the Bell of Pennsylvania memorandum of understanding was the joint effort of the Legal Departments of Bell of Pennsylvania and AT & T. For reasons of their own, they apparently concluded that Bell of Pennsylvania would be adequately protected from liability for matters over which it would have no control, by having AT & T "concur" in the memorandum of understanding, to the extent of assuring compliance with the provisions of the memorandum of understanding relating to the rights of transferred employees. Paragraph 13 was added to the Bell of Pennsylvania memorandum of understanding, and was complied with by Bell of Pennsylvania and AT & T, in order to accomplish that objective.

Thus, ¶ 13 makes clear that Bell of Pennsylvania was committing itself to provide protection only for employees transferred to entities over which Bell of Pennsylvania would have control, and that its obligations with respect to other transferred employees would be limited to requesting AT & T to provide such protection by its "concurrence", to that extent, in the memorandum. When that concurrence was promptly furnished, the situation was as follows: Bell of Pennsylvania was required to provide collective bargaining agreement protection to all employees transferred to any subsidiary or affiliate of Bell of Pennsylvania, or any other entity over which Bell of Pennsylvania would have continuing control; AT & T was obliged to provide collective bargaining agreement protection for Bell of Pennsylvania employees transferred to AT & T-related entities other than those affiliated with Bell of Pennsylvania; and Bell of Pennsylvania was obliged to require transferees of business assets (in my view, whether or not accompanied by the transfer of employees) to agree to be bound by the collective bargaining agreement.

This three-pronged approach was not necessary in the case of the three national agreements, in part because AT & T itself was a party to those agreements, thus rendering them binding upon all component parts of the entire corporate system; and in part, apparently, because the parties to the Bell of Pennsylvania memorandum of understanding were focusing upon the fact, known to them, that Bell of Pennsylvania would be transferring significant portions of its business assets, for continued operation by plaintiff, in advance of any transfer of employees.

At the risk of unduly laboring the point, what was omitted from ¶ 12 of the Bell of Pennsylvania agreement, but included in the three national agreements, was the following language:

> "In addition, each wholly owned Bell System company agrees that the terms and conditions of such [collective bargaining] agreement shall be fully binding on any successor organization to which employees covered are transferred."

Bell of Pennsylvania could not agree to that language, because it knew that its employees would be transferred to entities with which it would no longer be affiliated in any way. All four memoranda of understanding contained the language that "[each company] will secure as a condition of any sale or other transfer of ownership of all or part of its business and physical assets, the assent of any successor organization that such agreement shall continue in effect and bind the successor organization." Thus, even if plaintiff were correct, and the Bell of Pennsylvania memorandum of understanding be deemed modified into a carbon-copy of the national agreements, the result would be the same: Bell of Pennsylvania, like all of the Bell System companies covered by the national agreements, was bound to make it a condition of the sale of business assets that the successor firm which would be conducting that part of the business would agree to be bound by the collective bargaining agreement.

Once it is determined that Bell of Pennsylvania and the defendant union did intend that Bell of Pennsylvania would be required to obtain plaintiff's assent to be bound by the collective bargaining agreement, and that ¶ 12 of the memorandum of understanding so provides, the only remaining question is whether plaintiff—which was not a signatory to the memorandum of understanding, and which has never, at least in writing, expressed its consent to be bound—is also required to be bound by the collective bargaining agreement. In my 1983 Bench Opinion, I stated that it was "inconceivable" that plaintiff could have been unaware that Bell of Pennsylvania was supposed to obtain plaintiff's consent to be bound by the collective bargaining agreement. The Court of Appeals expressed its uncertainty as to the basis for that factual assumption, and remanded for clarification of the finding (*inter alia*). Actually, my comment from the bench was an inadvertent understatement: Plaintiff has always conceded that it was aware of Bell's obligations under ¶ 12 of the memorandum of understanding. The point was admitted in plaintiff's answer to defendant's interrogatory No. 17, which was referred to in the course of the 1983 hearing but not, apparently, included in the record on appeal.

Plaintiff's contention is not that it was unaware of the provisions of ¶ 12 of the Bell-defendant memorandum of understanding, but that ¶ 12, properly construed, does not apply to the transfer of telephone stores to plaintiff. Alternatively, plaintiff argues that, regardless of the true meaning of ¶ 12, plaintiff's assumption that it did not apply to the telephone stores' transfer was reasonable. The first of these arguments has been rejected, above. And the alternative argument fails, for several reasons.

In the first place, there is no evidence, one way or the other, as to what plaintiff may have thought ¶ 12 of the agreement meant. No witness from plaintiff testified on that or any other subject.

In the second place, and more importantly, plaintiff did not exist when the memorandum of understanding between Bell of

Pennsylvania and the defendant union was executed. Plaintiff was created later, by AT & T, its parent. Whatever understanding plaintiff may have had of the meaning of ¶ 12 at the time of the conveyance of the telephone stores in January 1983 necessarily came from AT & T, its parent. AT & T was very much involved in the negotiation and execution of ¶ 12, and, by its "concurrence", was partially a party to that agreement. Plaintiff cannot be permitted to say that its understanding of ¶ 12 was any different from that of AT & T (and Bell of Pennsylvania, since ¶ 12 was jointly drafted by Bell of Pennsylvania and AT & T).

### B. *Other Factors*

It is, I suggest, helpful to consider the larger picture. In 1980, faced with the prospect of complying with an FCC order to separate its regulated from its unregulated businesses, AT & T, on behalf of all of its component parts, negotiated agreements with all of the national unions representing the employees of all of the companies, with a view toward protecting the workers from adverse consequences, and protecting the employers from having to treat every employee-transfer as a "layoff". At that time, the defendant union was affiliated with a national union, and its members were therefore protected by the resulting 1980 agreement. In 1982, the Consent Decree in the government antitrust action mandated additional changes. AT & T again instituted and carried out negotiations with the three national unions, and arrived at agreements which were satisfactory to all concerned. If the defendant union had continued as an affiliate of TIU, its members would have been protected by the 1982 national agreement. There can be no question, in my view, that if the TIU national agreement were applicable in this case, it would mean that the plaintiff is bound by the collective bargaining agreement. After all, AT & T signed the TIU agreement on behalf of itself and all of its subsidiaries and affiliates. It can scarcely be thought that AT & T could avoid compliance with the 1982 TIU agreement by the

simple expedient of creating a new subsidiary to conduct part of its business. And there is absolutely no reason to suppose that any of the parties contemplated that the result would be different for Bell of Pennsylvania employees by reason of the fortuitous circumstance that the defendant local had, in the interim, disaffiliated itself from TIU. Obviously, as plaintiff itself has consistently argued, the parties wished to place the defendant local and its members in the same general position as all of the other unions and employees in the entire conglomerate.

■ In 1982, there was in full force and effect a collective bargaining agreement between Bell of Pennsylvania and the defendant union. It provided certain protections to the employees represented by the defendant, and provided for the arbitration of grievances. Bell of Pennsylvania obligated itself to condition any transfer of portions of its business upon the transferee's agreement to be bound by the collective bargaining agreement. It has been stipulated in this case (pre-trial stipulation, ¶ 17) that AT & T directed Bell of Pennsylvania to transfer the telephone stores to the plaintiff without requiring the plaintiff to accept the collective bargaining agreement; and that plaintiff, if requested, would have refused to accept the collective bargaining agreement; and that, nevertheless, AT & T would have insisted upon Bell's completion of the transfer. In my view, it would be totally unconscionable to hold that AT & T and its two wholly owned subsidiaries, or any combination thereof, should be permitted to ignore the collective bargaining rights of the defendant union and its members in this fashion. All three corporations—AT & T, Bell of Pennsylvania, and plaintiff—were aware of Bell of Pennsylvania's obligations under ¶ 12 of the memorandum of understanding with the defendant union; indeed, AT & T had partially assumed the obligations of that agreement. The suggestion that AT & T can require both of its wholly owned subsidiaries to ignore those obligations, and that plaintiff has no responsibility as the succes-

sor to Bell of Pennsylvania, is totally unacceptable.

The label to be attached to the legal/equitable principles involved is, I believe, unimportant. It is, no doubt, a form of corporate veil-piercing: a parent corporation cannot be permitted to juggle its subsidiaries or take advantage of the corporate formalities in order to perpetrate a legal wrong on third parties. Or, it can perhaps be viewed as a matter of agency: In its total control over all aspects of the conglomerate-restructuring, AT & T acted as the agent for each of its wholly owned subsidiaries, including those yet-to-be-born.

Finally, it should be noted that, unless plaintiff is bound by the collective bargaining agreement, Bell of Pennsylvania would plainly be in breach of ¶ 12 of the memorandum of understanding. It is indeed doubtful that the policies underlying both the FCC proceeding and the government antitrust action would be served by a ruling which would enable AT & T thus to shift the burdens associated with compliance with a collective bargaining agreement pertaining to business being conducted by plaintiff, which continues to be a wholly owned subsidiary of AT & T, to Bell of Pennsylvania, which was divested in 1984.

For all of these reasons, I persist in the view that the plaintiff is bound by the terms of the collective bargaining agreement, with respect to its operations between January 1, 1983, when the telephone stores and related assets were conveyed to plaintiff, and the date in 1984 when employees represented by the defendant union were transferred from the employ of Bell of Pennsylvania to plaintiff's employ.[2] This does not, of course, necessarily mean that the FCC order, the Consent Decree,

and the resulting reorganizations are irrelevant to the interpretation and enforcement of the provisions of the collective bargaining agreement. Those impacts will be discussed below. But it does mean, in my view, that all of the three grievances involved in this case were and are arbitrable.

## III. THE GRIEVANCES AND THE ARBITRATION AWARDS

The first two grievances, referred to as "the *Inquirer*" case and the *"Sunguard* case" were decided in favor of the union by a board of which Mr. Moskowitz was the neutral chairman. In the third matter, which may be referred to as the "delivery and inventory dispute", a board of arbitrators headed by neutral Chairman Christensen found that the company was in violation of the collective bargaining agreement, but deferred decision as to the appropriate remedy. Plaintiff challenges all three awards on the ground of the arbitrators' lack of jurisdiction, but that issue has been resolved, adversely to plaintiff, in the preceding portion of this Opinion. As I understand it, apart from the jurisdictional argument, plaintiff does not question the correctness of the arbitrators' decision in the *"Sunguard* case" or in the "delivery and inventory dispute" matter. At any rate, given the very limited scope of judicial review in these matters, I see no reason to disturb those two awards.

■ Plaintiff is on firmer ground, however, with respect to the award in the *"Inquirer* case"*. As a preliminary matter, I reject the defendant union's argument that plaintiff's challenge to the Inquirer arbitration award is time-barred. Plaintiff sought to enjoin the scheduled arbitration in that matter before it occurred, and the Amended Complaint specifically seeking to set

---

**2.** One of the interesting anomalies in this case is that plaintiff has always conceded that the collective bargaining agreement in question is "administered" by plaintiff, and is binding upon plaintiff in certain respects, insofar as the agreement provides job security for transferred employees. The reasoning process by which protection against layoffs becomes the only provision of the collective bargaining agreement

which is binding upon plaintiff has never been clear to me. Under plaintiff's own interpretation of the relevant documents, all of the employees transferred from Bell of Pennsylvania to plaintiff who were covered by the collective bargaining agreement continue to be covered by it—in all respects, not just on the question of layoff.

aside the award in that case was filed less than four months after the award was rendered. Under *DelCostello v. International Brotherhood of Teamsters*, 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983), and *Local Union 1397 v. United Steelworkers of America*, 748 F.2d 180 (3d Cir. 1984), plaintiff's claims are not time-barred.

In October 1982, Bell of Pennsylvania entered into a "transition agreement" for the sale of a telephone system to the Philadelphia Inquirer. The system included a Dimension 2000 PBX, a Pro 500, 350 telephone sets, riser cable, and floor or flat wire. The Bell representative in these negotiations was a Mr. Whitecotton.

Under the terms of the "transition agreement", the Inquirer was given the right to cancel the agreement of sale at any time after January 1, 1983 if, after negotiating with plaintiff, it chose to enter into a new agreement with the plaintiff.

The Inquirer exercised its option to cancel the contract with Bell of Pennsylvania, and renegotiated its order for the system with plaintiff. These negotiations were conducted for plaintiff by the same Mr. Whitecotton who had formerly worked for Bell of Pennsylvania. Under the new arrangement, the Inquirer chose to purchase only certain component parts of the system from plaintiff. Specifically, the Inquirer purchased its own flat wire and arranged with its own electrical contractor to install the flat wire (running under the carpet from the junction box to the telephone). The union contended, and a majority of the arbitrators agreed, that plaintiff breached the collective bargaining agreement by permitting this "piecemeal" arrangement to be carried out in a way which deprived covered employees represented by the defendant union of the flat-wire installation work.

As I understand it, the union argument, accepted by the arbitrators, is that the net effect of the final arrangement with the Philadelphia Inquirer was that, contrary to established practice, the plaintiff was permitting flat-wire installation work to be performed by "outside contractors", whereas that work should have been preserved for the workers represented by the defendant. I have great difficulty reconciling that result with the language of Article 17.01 of the collective bargaining agreement, which, as noted above, requires the company to "maintain its established policies as to the assignment of work in connection with the installation and maintenance of *communications facilities owned, maintained and operated* by the Company." The flat-wire portion of the installation was owned by the Philadelphia Inquirer, purchased from an outside source.

It is doubtful, in my view, that the collective bargaining agreement could properly have been interpreted, at any time, as enabling the union to dictate to the company the terms and conditions of the company's transactions with its customers. But whatever may have been the situation in the era preceding the FCC order and the Consent Decree in the antitrust case, there can be no doubt that, in October 1982 and January 1983, it was encumbent upon the plaintiff to grant its customers the kind of flexibility represented by the sale to the Philadelphia Inquirer.

■ I conclude, therefore, that the arbitrators' award in the *Philadelphia Inquirer* case must be vacated and set aside, both because the award does not draw its essence from the terms of the collective bargaining agreement, and because, in any event, its enforcement would be contrary to public policy.

### ORDER

AND NOW, this 14th day of May, 1985, it is ORDERED:

1. Upon consideration of plaintiff's application for declaratory judgment, it is ADJUDGED, DECLARED, AND DECREED that the plaintiff is bound by the terms of the collective bargaining agreement between Bell of Pennsylvania, Inc. and the defendant union, dated August 1980, which was in effect during 1983.

2. Plaintiff's application for an injunction against further arbitration proceedings is DENIED.

3. Plaintiff's application to vacate and set aside the respective awards of arbitrators is, with respect to the awards in the *"Sunguard"* case and the "delivery and inventory dispute" case, DENIED.

4. Plaintiff's application to vacate and set aside the award of arbitrators is, in the *Philadelphia Inquirer* case, GRANTED, and said award is VACATED AND SET ASIDE.

5. Each party to bear its own costs.