**UNITED FOOD AND COMMERCIAL WORKERS UNION, et al., Plaintiffs,**

v.

**FLEMING FOODS EAST, INC., et al., Defendants.**

No. Civ.A. 95–2587 JHR.

United States District Court, D. New Jersey.

June 29, 2000.

franchise at all, as opposed to a license.

Mark Belland, Tomar, Simonoff, Adourian, O'Brien, Kaplan, Jacoby & Graziano, P.C., Cherry Hill, NJ, for plaintiffs.

Michael McCaney, Heller, Kapustin, Gershman & Vogel, Blue Bell, PA, Timothy Duggan, Stark & Stark, P.C., Princeton, NJ, for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

RODRIGUEZ, District Judge.

### I.  Introduction

Plaintiffs, United Food and Commercial Workers Union and Participating Employ-

ers Tri–State Health and Welfare Fund (the "Health & Welfare Fund") and United Food and Commercial Workers and Participating Employers Tri–State Pension Fund (the "Pension Fund") (the Health & Welfare Fund and the Pension Fund hereinafter referred to collectively as the "Plaintiffs" or the "Funds") bring this action against Defendant Fleming Foods East, Inc.[1] and Fleming Companies, Inc. (collectively, "Fleming") under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1145 and for tortious interference with contract.

A bench trial was held on October 19–21, 1998. Having carefully considered the credibility of the witnesses, all of the evidence and the arguments of counsel for the parties, the Court renders the following Findings of Fact and Conclusions of Law in accordance with Federal Rule of Civil Procedure 52(a).

## II. Findings of Fact[2]

### A. Background

1. The Funds are jointly administered, multi-employer, employee benefits plans governed under the provisions of ERISA and the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 186 *et. seq.* The Funds provide a comprehensive scheme of medical related and retirement benefits to eligible employees and their dependents who are employed by employers in the retail food industry. The Funds are financed by way of contributions remitted by companies that are signatory to collective bargaining agreements with various Locals of the United Food and Commercial Workers Union.

2. Fleming is one of the world's largest distributors of wholesale food products much of which is distributed to retail food establishments. The company reported sales in 1995 of over $17 billion and net income of $42 million. Fleming is in the business of supplying grocery and other food related products and support services to supermarkets, including such things as retail accounting services, computer services, inventory management, equipment leasing and electronic services. October 19, 1998 Trial Transcript (hereinafter "Tr. I") at 153.

3. Fleming is constantly attempting to increase its business by locating suitable food establishments for acquisition. A small percentage (approximately 25%) of supermarket retailers are able to obtain complete financing elsewhere, but approximately 75% resort to Fleming, generally for inventory financing. Thus, Fleming is also an incidental lender, where the loan function is incidental to its primary mission. Fleming is a lender of last resort.

4. During October 1990 through July 1991, Fleming negotiated with Mayfair Supermarkets, Inc., t/a Foodtown (hereinafter, "Mayfair") for the purchase of five supermarket locations in New Jersey. On July 18, 1991, Fleming and Mayfair executed an Asset Purchase Agreement for the purchase by Fleming of the five supermarket locations for a total purchase price of $7.9 million. The five stores that were the subject of the Asset Purchase Agreement were known as the "Cherry Hill Store," the "Somerdale Store," the "Moorestown Store," the "Haddon Store," and the "Pennsauken Store." The portion of the purchase price allocated to the Pennsauken store was $1,110,000.00.

5. Fleming identified five operators to run each of the five different locations. Carlo DiMichele ("DiMichele") was identified as the operator for the Pennsauken Store. At the time, DiMichele had forty years' experience in the supermarket industry. Contemporaneous with its purchase of the stores from Mayfair, Fleming assigned its rights under the Asset Purchase Agreement to each of the five opera-

---

1. Fleming Foods East, Inc. no longer exists. Fleming Companies, Inc. is the successor by merger to the obligations of Fleming Foods East, Inc.

2. Factual findings that do not contain citations to the record have been stipulated by the parties or are undisputed.

tors. The rights to the Pennsauken Store were assigned to DiMichele, Carmella DiMichele and Meels, Inc. ("Meels") through an Assignment of Asset Purchase Agreement dated July 18, 1991.

6. DiMichele was to operate the Pennsauken Store through Meels. Meels was a New Jersey corporation formed by DiMichele in August 1989 for the purpose of purchasing a supermarket in Runnemede, New Jersey, which never materialized. DiMichele was the sole shareholder, officer and director of Meels. Meels was not a subsidiary of Fleming and Fleming never owned any shares of Meels stock. Its corporate records were maintained by DiMichele's attorney, John A. Jones. Meels adopted by-laws and held annual meetings of the Board of Directors and shareholders in 1992 and 1993. No representative of Fleming attended these meetings or has ever served as an officer or director of Meels.

7. Neither DiMichele nor Meels had sufficient assets to consummate the transaction with Mayfair for the Pennsauken Store. Therefore, the parties agreed that Fleming would finance the transaction with Mayfair for Meels through loans totaling $1,200,000.00. Contrary to most lending practices, Fleming rather than DiMichele determined the ultimate amount of the loan. See October 20, 1998 Trial Transcript (hereinafter, "Tr.II") at 16; Tr. I at 101; October 21, 1998 Trial Transcript (hereinafter, "Tr.III") at 18–19 (expert opinion of Richard H. Weidner[3]). Also contrary to standard lending practices, Fleming prepared the underlying financial documents on behalf of Meels. Tr. III at 18–19.

8. As early as April 10, 1991, Fleming received financial information from Mayfair on the operation of the Pennsauken Store, including sales figures, gross profits, equipment inventories and other expenses, as well as copies of the union contracts, employee lists and rates of pay. Tr. I at 57–60, 69; Tr. II at 8, 30. This information, together with DiMichele's financial statement and his "operating knowledge of the business," was used by Fleming to prepare an internal financing package (the "Financing Package") containing various financial documents regarding the funding and anticipated operation of the Pennsauken Store. Tr. I at 100; Pl.Exs. 49–54. These documents included a *Pro Forma* financial statement and a detailed Marketing Plan.

9. The Marketing Plan was prepared by Fleming representatives and arguably incorporated DiMichele's store policies and procedures and his anticipated costs of operation, including labor expenses. Tr. I at 68–69, 100. Although the Marketing Plan, including the Pennsauken Store's labor budget, was completed in May 1991, the new collective bargaining agreement ("CBA") with the United Food & Commercial Workers Union, Local 1360 ("Local 1360") was not ratified until August 1991, approximately three months later. Tr. I at 70–72.

10. The only access DiMichele had to the labor contracts was through Fleming, which had obtained that information from Mayfair in April 1991. Tr. I at 59–60, 62; DiMichele Dep. at 42–46. Negotiations between Local 1360 and each of the five operators took place in the first half of 1991. Attorney Al Fiergang, who had acted on behalf of Fleming in the past, represented the five operators during the negotiations. Tr. I at 109. Representatives of Local 1360 believed that Fleming was playing an active role in the negotiations and was requesting concessions in order to consummate the purchase of the five su-

---

**3.** Where cited, the Court adopts as fact the opinion of Plaintiff's banking expert, Richard Weidner. The Court found Mr. Weidner to be a very credible witness who performed an exhaustive review of the record in this case, including the financial documents and depositions. At trial, Mr. Weidner exhibited a thorough knowledge and understanding of these materials and of relevant banking and lending practices. The Court notes that it does not adopt the opinions of Robert J. Bifalco, Defendant's expert witness, as he testified to a review of only limited portions of the Loan Agreement.

permarket locations from Mayfair. As a result of this belief, representatives of Local 1360 advised Fleming of the successor language in the Mayfair collective bargaining agreement upon learning of the impending sale. At the time of the negotiations, Fleming was aware of the labor costs at the Mayfair locations, including the Pennsauken Store. Fleming would benefit, at least indirectly, from a favorable labor contract because such a contract would help operators succeed more. Tr. I at 99, 106–07.

11. Because Fleming would be looking to DiMichele's net worth as collateral for the loan, DiMichele submitted a one-page personal financial statement. This statement was unaudited and unsworn and reflected a personal net worth of $475,000. Tr. I at 71–73; Pl.Ex. 52. Of this amount, $59,000 was tied-up in his pension plan and was unreachable by a creditor. Tr. I at 20, 74–75, 115–16. Approximately one-third of his personal net worth was in the stock of Johnmar Millville, Inc., for which Fleming did not determine a market value because it was not sold on the open market. Tr. I at 115. Fleming never asked for or reviewed DiMichele's tax returns or audited financial statements. Tr. I at 74, 115. Nor did Fleming conduct an analysis or valuation of the net worth of Meels' fixtures and equipment which would serve as collateral on the loan. Tr. II at 20. Based on the financial information available to Fleming, the personal guarantees of DiMichele were "worthless." Tr. III at 23.

12. Nonetheless, the Financing Package was approved by John Traub, Catherine Gold and Mark Batenic because they thought it was "reasonable" and because the total anticipated transfers to Fleming from the Pennsauken Store would be over $43 million. Tr. I at 62–63, 76–78, 110–11; Pl.Ex. 14 (May 28, 1991 Letter from Mark Batenic to Mr. Mangold recommending loan package and noting that "Carlos has a

history of running a good, tight operation and is very comfortable with the labor projection which he has included on the pro forma. The store will be operated as a union store and a favorable contract will be negotiated with the new operators and the union."). Although Fleming maintains a written company policy governing the approval of loans for the acquisition of new stores, none of these three individuals were aware of, or relied upon, that policy. Tr. I at 64–65, 110–13. After their approval, the Financing Package was subsequently sent to corporate headquarters where the loan to Meels in the amount of $1,015,000 was approved. Tr. I at 63–64.

13. No arms-length lender, in any capacity, would have approved this loan in light of "the lack of hard collateral, small profit margin, questionable cash flow, lack of personal assets for the individuals guaranteeing the loan." Tr. III at 19–24. Meels never would have been able to obtain credit in the open market or operate without the support it received from Fleming. Tr. III at 71–72 (opinion of Mark Lavinsky [4]).

14. Prior to entering into agreements with Fleming to purchase the Pennsauken Store, DiMichele reviewed these documents with his accountant and attorney. He also visited the store and discussed the store with a Mayfair representative and representatives of Fleming.

### B. The Financial Documents

15. The closing on Fleming's five-store acquisition from Mayfair took place on August 8, 1991. Simultaneously with that closing, Fleming and Meels entered into a Loan Agreement which provided for a principal loan in the amount of $1,015,000.00 for the purchase from Mayfair of inventory and fixtures at the Pennsauken Store. Pl.Ex. 37. Under the terms of the Loan Agreement, the loan was to be repaid over a period of seven years, at an interest rate of prime plus three points.

4. Where cited, the Court adopts as fact the expert opinion of Mark Lavinsky. Mr. Lavinsky was a credible witness who exhibited extensive knowledge of and familiarity with the financial documents in this case and with the accounting field in general.

The Loan Agreement also provided for a second loan in the amount of $185,000.00 for accounts payable.

16. Pursuant to the terms of the Loan Agreement, Meels agreed to the following obligations:

(a) to maintain minimum life insurance in the amount of $250,000 on all of its officers, Pl.Ex. 37 ¶ 6.11;

(b) to refrain from purchasing or redeeming shares of stock, paying dividends, or permitting any change in the stock ownership of Meels as long as any obligation of Meels to Fleming existed under any of the loan documents, Pl.Ex. 37 ¶¶ 6.30 and 6.31;

(c) to provide Fleming with annual and interim financial statements and weekly sales reports, Pl.Ex. ¶ 6.1(a)–(c); Tr. I at 39–40;

(d) to notify Fleming of any material litigation against it and the occurrence of any default, Pl.Ex. 37 ¶ 6.1(e);

(e) to allow Fleming to inspect the properties of Meels, including financial and accounting records, upon reasonable notice, Pl.Ex. 37 ¶ 6.3;

(f) to refrain from entering into or conducting any business or operation other than the operation of the Pennsauken Store or to make any investments other than those approved by Fleming, Pl.Ex. 37 ¶ 6.5;

(g) to maintain and provide an inventory at the end of every four-week accounting period, or quarterly, using crews acceptable to Fleming, Pl.Ex. 37 ¶¶ 6.3, 6.7;

(h) to permit Fleming, on an unannounced basis, to count the cash on hand, reconcile the actual cash on hand with that reported by Meels and perform a detailed analysis of the items counted, Pl.Ex. 37 ¶¶ 6.3, 6.7;

(i) to maintain hazard insurance and other insurance coverage designating Fleming as mortgagee under a standard mortgage clause; Pl.Ex. 37 ¶ 6.10;

(j) to refrain from incurring any indebtedness in excess of $15,000 not arising out of the ordinary course of business, Pl.Ex. 37 ¶¶ 6.13–14;

(k) to refrain from entering into any lease requiring payment of rent in excess of $15,000 per year without Fleming's consent, Pl.Ex. 37 ¶ 6.16;

(l) to refrain from amending or modifying its organizational documents, Pl.Ex. 37 ¶¶ 6.28–6.29;

(m) to refrain from changing its accounting methods, Pl.Ex. 37 ¶ 6.19;

(n) to refrain from selling its assets serving as collateral, other than through the sale of inventory in the ordinary course of business, Pl.Ex. 37 ¶ 6.32;

(o) to enter into a supply agreement with Fleming, Pl.Ex. 37 ¶ 6.25;

(p) to maintain a minimum inventory level of $340,000 on a FIFO basis, Pl.Ex. 37 ¶ 6.7;

(q) to maintain a minimum ratio of current assets to liability of 2.16 to 1, Pl.Ex. 37 ¶ 6.20;

(r) to maintain a tangible net worth of $215,000, Pl.Ex. 37 ¶ 6.21;

(s) to maintain a debt to tangible net worth ratio of no more than 6.0 to 1, Pl.Ex. 37 ¶ 6.22;

(t) to maintain minimum working capital of $400,000, Pl.Ex. 37 ¶ 6.23; and

(u) to refrain from compensating employees at a rate higher than prevailing rates in the area, Pl.Ex. 37 ¶ 6.33.

17. Simultaneously with execution of the Loan Agreement, Meels executed a Promissory Note to Fleming as evidence of the $1,015,000.00 loan. Pl.Ex. 2.

18. In accordance with the terms of the Loan Agreement and to ensure that Fleming would realize the annual transfers projected in the Financing Package, Fleming and Meels entered into a supply agreement (the "Supply Agreement"), whereby Meels was required to maintain a "Teamwork Score" of 55%. Pl.Ex. 95. This score was determined by dividing the total purchases of Fleming products by the total retail sales at the Pennsauken Store. Pl. Ex. 95. This had the effect of requiring Meels to purchase more than half of its inventory from Fleming. Tr. I at 76–78,

134. Fleming would not have financed Meels' acquisition of the Pennsauken Store without the Supply Agreement. Tr. I at 76–77, 124.

19. Also in accordance with the terms of the Loan Agreement and as security for the loan, Fleming and Meels executed a Security Agreement whereby Fleming retained a security interest in the assets of Meels. Pl.Ex. 35.

20. Meels, DiMichele and Carmella DiMichele entered into a Lease Agreement with Mayfair for lease of the land and building where the Pennsauken Store was located for a term of seven years. The Lease Agreement was guaranteed by Fleming pursuant to a Guaranty of Lease Agreement with Mayfair. Pl.Ex. 41. As consideration for Fleming's guaranty, Meels, DiMichele and Carmella DiMichele entered into a Guaranty and Indemnification Agreement with Fleming whereby Meels agreed to pay Fleming 5% of the rental costs of the subject property and to hold Fleming harmless from any claims brought by Mayfair against Fleming as a result of Fleming's guaranty. Pl.Ex. 42. In effect, Meels forfeited any defenses that it had to the transaction in the event of default.

21. In further accordance with the Loan Agreement, Meels executed a Leasehold Mortgage whereby it granted Fleming a mortgage covering its leasehold interest. Pl.Ex. 34; Tr. I at 82–83. Fleming and Mayfair simultaneously executed an agreement granting Fleming curative rights, effectively allowing Fleming to control the location for the period of the lease if the Pennsauken Store under Meels failed. Pl.Ex. 36; Tr. I at 83. After Meels and DiMichele shut down operations, Fleming brought in another operator to run the Pennsauken Store. Tr. I at 83–84.

22. Fleming, through the foregoing financial agreements, controlled operations at the Pennsauken Store because the different requirements detailing how business should be conducted and "the extent of the reporting" required. See Tr. III at 27.

The terms of the Loan Agreement "got into the nitty gritty, the operations of the company. It just went to the whole fabric of the operation." Tr. III at 28. The Supply Agreement created a conflict of interest and took away one of Meels' few controllable costs by requiring that it maintain an ongoing minimum inventory of $350,000, with 55% of that coming from Fleming. Tr. III at 28–29. Together with the lease arrangement, Fleming controlled the property, the inventory, the equipment and essentially "all of the underlying assets and . . . [Meels was] the interchangeable part of the transaction." Tr. III at 27–32.

C. Operation of the Pennsauken Store

23. Subsequent to the August 8, 1991 closing, DiMichele operated the Pennsauken Store through Meels under the trade name of "Shop 'N Bag." This is a licensed trademark owned by Fleming, who also uses the name "Thriftway" in a similar manner. DiMichele's decision to use the Shop 'N Bag trade name made it mandatory for DiMichele to participate in Fleming's directed advertising and pricing for the Shop 'N Bag group of stores. Tr. I at 163. The retailers who comprise the Shop 'N Bag advertising group meet once a week to select prices for advertised specials from Fleming's suggested retail price zones. Tr. I at 162–63. Each meeting is attended by a Fleming marketing coordinator who provides the retailers with Fleming's core ad and suggested price zones. Tr. I at 163–64. Thus, in any given week, Fleming essentially controlled the price of certain goods.

24. Fleming assigned sales counselors to monitor the Pennsauken Store's operations. The position of sales counselor is a management position and requires individuals with specialized knowledge or retail operations, merchandising, advertising and products. Tr. I at 138 and Pl.Ex. 77. According to the company's job description, the function of a sales counselor is "[t]o obtain the sales goal set for the territory by counseling retail members in store

operations and merchandising programs, to insure their growth, profitability and support." A sales counselor visits Fleming supplied stores on a regular basis and serves as a liaison between Fleming and the operator. A sales counselor gives advice and education but has no power or authority to instruct operators as to how to conduct their business. Sales counselors visited the Pennsauken Store sixty-eight times during the approximately thirty-one months it was operated by Meels. Tr. I at 143.

25. The Fleming employees assigned to monitor the Pennsauken Store were not limited to sales counselors. Fleming also sent a diverse array of specialists to monitor the Pennsauken Store, including such things as frozen food specialists, deli specialists, produce specialists, meat specialists, bakery specialists, technology specialists and specialists in retail merchandising. Tr. I at 152–55. These specialists were used when a sales counselor identified a problem with operations at the Pennsauken Store. Tr. I at 142–43. It is unclear how frequently Fleming specialists visited the Pennsauken Store because, unlike sales counselors, they did not keep log books or records showing their visits to stores. Tr. I at 140, 146.

26. Flemings sales counselors and specialists monitored the Pennsauken Store's operations through the quarterly financial statements and weekly sales reports submitted by Meels. These allowed Fleming to monitor Meels' compliance with the *Pro Forma* and Supply Agreement, and operations in general. Tr. I at 88, 120. Thus, as early as December 1991, Meels was in violation of the Loan and Supply Agreements. Tr. I at 135–36. Similarly, Fleming learned and objected to DiMichele's purchase of a vehicle without Fleming approval. Pl.Ex. 25.

27. As a result of the frequent and regular reporting and on-site monitoring, Fleming was continuously aware of problems at the Pennsauken store and was able to analyze them. For example, in December 1991, Fleming attributed them to

problems with salary, advertising, expense controls and shortfall in capital. Pl.Ex. 26; Tr. I at 118, 135–37. As a result, a sales counselor was sent to the Pennsauken Store to "assist" in raising the Teamwork Score up to the score required under the Supply Agreement and to help DiMichele get his wage percentage back in line. Tr. I at 136, 150. Problems at the Pennsauken Store escalated to the point where Fleming prepared a "retail action plan" through its sales counselors and specialists to improve the Pennsauken Store's sales, profits, customer patronage, and store operations. Tr. I at 143–46; Pl.Ex. 106. A retail action plan can be requested by a sales counselor, owner or store manager. Tr. I at 155. At another point in time, a Fleming sales counselor indicated that a "full store reset" had to be done. A reset is ordered by a sales counselor, but requires the agreement of the retailer. Essentially, a reset involves changing the store's configuration and remerchandising its products by replacing discontinued items with new ones. Tr. I at 147, 154–55. This is accomplished by a sales counselor communicating the reset to other vendors in the community, who in turn come in and "reset" their part of the store. Although Fleming can order one, outside vendors cannot. Tr. I at 159.

28. Despite the problems at the Pennsauken Store, the first time Meels wrote checks to Fleming drawn on insufficient funds was in March 1994. Moreover, during the period Meels was in operation, it paid Fleming approximately ten million dollars. Tr. III at 71.

29. Flemings extensive on- and off-site monitoring, together with terms of the financial documents, in particular the Loan and Supply Agreements, allowed Fleming to exert enormous, essentially de facto, control over Meels and its operations at the Pennsauken Store. *See* Tr. III (testimony of Weidner and Lavinsky). Although technically Meels was a separate entity, these financial arrangements resulted in Meels operating essentially to accom-

plish the business objectives of Fleming. *See* Tr. III (testimony of Weidner and Lavinsky).

30. DiMichele was required by Fleming to make an initial equity contribution of $200,000.00. Despite this requirement, DiMichele's equity contribution was $25,000 short. Tr. I at 116. As of February 1992, he had not taken any action to rectify the deficiency. Fleming had knowledge of it and did not take action either. When he finally did rectify it, he did so by borrowing money from his existing corporations to satisfy his obligation with Fleming, which Fleming ultimately learned. Tr. I at 117–18. Thus, out of the $200,000 equity contribution, he borrowed $100,000 from his other corporations. Tr. I at 117; Pl.Ex. 26.

31. Given the nature of the business, even if DiMichele had timely paid his initial contribution of $200,000, there would have been insufficient capital to sustain the operation. Tr. III at 61–65. Meels was grossly undercapitalized from its inception. By March 1992, Meels was already in violation of the current ratio required under the Loan Agreement. Tr. III at 66. It was insolvent in less than a year. Tr. III at 61–71.

32. As of September 1992, the Pennsauken Store was not operating profitably. Tr. I at 122. Nonetheless, Fleming extended an additional $500,000 to DiMichele (through Mella, Inc.) to open another store in Folcroft, Pennsylvania. Tr. I at 108, 123. This additional $500,000 was secured by the same collateral as the Pennsauken loan. Tr. I at 123. At the time of the loan, the Pennsauken Store had already lost significant amounts of money, and the personal guarantees of DiMichele and Carmella DiMichele and Meels were worthless. Tr. III at 25–26. No arms length lender would have approved this loan. Tr. III at 26. Ultimately, Folcroft also failed and Fleming has never been able to collect its debt. Tr. I at 108.

33. After Meels took over operation of the Pennsauken Store, DiMichele suffered from health problems and was frequently absent for an extended period of time. Tr. I at 102. Even before his illness, however, DiMichele's son Cubby primarily managed the operation. Tr. I at 147–48, 172. DiMichele also suffered a loss of capital as a result of litigation of a sexual harassment lawsuit. Tr. I at 102. Although Fleming was aware of these facts, all of which technically constituted defaults under the Loan Agreement, it took no action.

34. In 1994, Fleming and DiMichele discussed restructuring the loan. Ultimately, Fleming decided not to restructure them because "at the time, the stores were so marginal that even if a case broke down or somebody spilled something they would have lost money again. There was just no reason to go any further with this." Tr. I at 121–22. When the decision was made to close the Pennsauken Store, Fleming did not obtain a list of other creditors or discuss payment to other creditors. Tr. I at 124–25. DiMichele voluntarily surrendered any rights to the store to Fleming. Although DiMichele owes Fleming the balance of the loan proceeds from the Pennsauken Store, Fleming has not taken any action to enforce the personal guarantees executed by DiMichele.

35. As a result of its other financial obligations, Meels did not pay contributions to the Funds, resulting in a substantial delinquency and thereby compelling the Funds to commence legal action to collect the delinquent amounts. The Plaintiff Funds obtained a judgment for delinquent contributions in this Court at Civil Action No. 94–1873(SSB) (consolidated with Civil Action No. 94–1966) in the sum of $54,750.33 against Meels. To date, no part of the judgment has been satisfied.

36. Since the closing of the Pennsauken Store 'N Bag, Fleming has obtained a new operator, Browns Supermarkets, Inc., which also operates the store as a Shop 'N Bag. Despite the fact the new operator obtained outside financing, it has a supply agreement with Fleming similar to that between Meels and Fleming. Tr. I at 131.

## III. Conclusions of Law

1. This Court has subject matter jurisdiction and jurisdiction over the parties. In addition, venue in this District is proper.

### A. Liability Under ERISA § 515.

2. Plaintiffs bring this suit under the Employee Retirement Income Security Act of 1974 ("ERISA") § 515, 29 U.S.C. § 1145, which requires an "employer" to make contributions to an employee benefit plan pursuant to the terms of an applicable collective bargaining agreement, and further imposes liability on an "employer" for unpaid contributions. An employer is defined as "any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan; and includes a group or association of employers acting for an employer in such capacity." 29 U.S.C. § 1002(5). Fleming asserts that it cannot be held liable for the delinquent contributions under the CBA because it does not qualify as an employer under this definition. The Funds acknowledge that technically Fleming was not a party to the CBA and that there is no liability under ERISA § 515 unless a person is a party to the collective bargaining agreement. The Plaintiffs contend that Fleming is nonetheless liable for the delinquent contributions because it was the alter ego of Meels. *See Board of Trustees, Sheet Metal Workers' Nat'l Pension Fund v. Elite Erectors, Inc.,* 212 F.3d 1031, 1037–38 (7th Cir.2000) (noting that "[e]fforts to pierce the corporate veil ask a court to hold A vicariously liable for B's debt ... [whereas] a contention that A is B's "alter ego" asserts that A and B are the same entity").

3. The Third Circuit has not expressly set forth the standard for piercing the corporate veil on an alter ego theory in an action to recover delinquent contributions under § 515 of ERISA. However, it is settled that federal law governs liability for breach of a labor contract between a union and employer, including liability based on a theory of corporate veil piercing. *American Bell, Inc. v. Federation of Telephone Workers of Pennsylvania,* 736 F.2d 879, 886 (3d Cir.1984); *see also United States v. Pisani,* 646 F.2d 83 (3d Cir. 1981).

4. As a general rule, the corporate entity should be upheld unless specific, unusual circumstances call for an exception. *Zubik v. Zubik,* 384 F.2d 267, 272 (3d Cir.1967), *cert. denied,* 390 U.S. 988, 88 S.Ct. 1183, 19 L.Ed.2d 1291 (1968). A court should disregard the corporate existence only when it appears that "a corporation was an artifice and a sham to execute illegitimate purposes and [an] abuse of the corporate fiction and immunity that it carries." *Kaplan v. First Options of Chicago, Inc.,* 19 F.3d 1503, 1520–22 (3d Cir.1994) (quoting *Wheeling–Pittsburgh Steel Corp. v. Intersteel, Inc.,* 758 F.Supp. 1054, 1058 (W.D.Pa.1990)), *aff'd in part,* 514 U.S. 938, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995). "The alter ego concept is a 'tool of equity'" which should be utilized by the courts only on clear and convincing evidence of "fraud, illegality or injustice, or when recognition of the corporate entity would defeat public policy or shield someone from public liability for a crime." *Kaplan,* 19 F.3d at 1521, 1522 (quoting *Carpenters Health & Welfare Fund of Philadelphia v. Kenneth R. Ambrose, Inc.,* 727 F.2d 279, 283–84 (3d Cir.1983)).

5. When determining whether the facts of a particular case warrant piercing of the corporate veil based on an alter ego theory, a court should engage in a fact-specific inquiry in light of the following factors:

First is whether the corporation is grossly undercapitalized for its purposes. Other factors are ... failure to observe corporate formalities, non-payment of dividends, the insolvency of the debtor corporation at the time, siphoning funds of the corporation by the dominant officers or directors, absence of corporate records, and the fact that the corporation is merely a facade for the operations of the dominant stockholder or stockholders.

*Pisani,* 646 F.2d at 88 (quoting *DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.,* 540 F.2d 681, 686–87 (4th Cir. 1976)). This list is not exhaustive, nor must all of the above factors be present to warrant a finding of alter ego liability. *American Bell, Inc.,* 736 F.2d at 886–87. Moreover, the Third Circuit has recognized that alter ego liability may be premised on some "less precise notion that the [two distinct] corporations simply acted interchangeably and in disregard of their corporate separateness." *American Bell, Inc.,* 736 F.2d at 886–87 (quoting *Publicker Indus., Inc. v. Roman Ceramics Corp.,* 603 F.2d 1065, 1070 (3d Cir.1979)). For example, the Third Circuit has found that alter ego liability may be appropriate where "the controlled corporation acted robot- or puppet-like in mechanical response to the controller's tugs on its strings or pressure on its buttons." *Culbreth v. Amosa (Pty) Ltd.,* 898 F.2d 13, 15 (3d Cir.1990) (considering alter ego liability under Pennsylvania and New Jersey law which require showing of "pervasive domination"). Thus, a court should impose alter ego liability where the facts of a case "present an element of injustice or fundamental unfairness." *Pisani,* 646 F.2d at 88.

6. Applying these principles and the *Pisani* factors to the facts of this case, the Court finds that the Plaintiffs have shown through clear and convincing evidence that Fleming was the alter ego of Meels and is liable to the Funds for Meels' delinquent contributions. In so finding, certain arguments raised by Fleming warrant express discussion. Fleming argues, in part, that (a) it cannot be held liable under an alter ego theory of liability because it had no ownership interest in Meels. Thus, traditional tests to determine alter ego status are inappropriate in this case; and (b) even under the *Pisani* analysis, Plaintiffs adduced insufficient evidence that Fleming functioned as an alter ego of Meels. As support for this argument, Fleming focuses primarily on its lack of a formal ownership in Meels, the fact that no representative of Fleming was ever an officer, director or shareholder of Meels and Meels' adherence to the corporate formalities. Fleming further notes that none of its representatives had the authority to sign checks on the account of Meels, to instruct Meels as to which of its creditors should be paid or given priority, and that its representatives were not present at the business premises on a daily basis.

7. Fleming's arguments are unpersuasive because they ignore the underlying purpose of the alter ego concept and are unsupported by the law, principles of equity and the facts of this case. At the outset, the Court notes that Fleming has not identified any authority that expressly states that alter ego liability may not be imposed on one entity because it lacks a formal ownership interest in the second. Nor has Fleming cited to any relevant precedent which holds that "ownership" is a determinative factor in the alter ego analysis, or states that the absence of an ownership interest requires a stricter standard. It is true that the natures of the alter ego concept and the principle of corporate veil piercing from which it derives are such that the issue of alter ego liability has arisen primarily in cases involving shareholders, parent and subsidiary corporations or successor corporations. At its core, however, the alter ego theory is designed to prevent injustice and fundamental unfairness. Whether it applies turns on the unique facts of a specific case. To make formal ownership a prerequisite to alter ego liability as Fleming suggests would serve to elevate form over substance and runs counter to the fundamental principles underlying such an equity doctrine.

As the Court has already described in its findings of fact, Fleming created a complicated and elaborate financial structure to enable Meels to operate the Pennsauken Store as a separate and independent corporate entity. In reality, however, Meels was little more than a "puppet" that allowed Fleming to aggressively pursue its own goals with virtual immunity. Contrary to its assertions, Fleming effectively

controlled the day-to-day operations at the Pennsauken Store. To allow Fleming to circumvent its ERISA obligations because it technically lacked an ownership interest in Meels or because Meels pursued all corporate formalities would be tantamount to condoning Fleming's manipulation of the corporate form to avoid its liabilities and obligations under ERISA. This, the Court will not do. The facts of this case present exactly the sort of injustice, fundamental unfairness and public policy concerns that the alter ego concept was designed to redress. Accordingly, the Court finds that Fleming was the alter ego of Meels and that it is liable to the Funds for Meels' delinquent contributions pursuant to ERISA § 515.

B. Tortious Interference With Contract

■ 1. The Funds further allege that Fleming tortiously interfered with contractual relations in violation of Section 301 of the LMRA, 29 U.S.C. § 185(a). The Third Circuit has held that a claim of tortious interference with a labor contract is one arising under federal common law over which the district court has jurisdiction. *Wilkes–Barre Publishing Co. v. Newspaper Guild of Wilkes–Barre, Local 120,* 647 F.2d 372, 381 (3d Cir.1981), *cert. denied,* 454 U.S. 1143, 102 S.Ct. 1003, 71 L.Ed.2d 295 (1982); *Young v. West Coast Industrial Relations Ass'n,* 763 F.Supp. 64, 76 (D.Del.1991), *aff'd,* 961 F.2d 1570 (3d Cir. 1992).

■ 2. To support a claim of tortious interference with a contract, a plaintiff must prove: (1) actual interference with a contract; (2) that the interference was inflicted intentionally by a defendant who is not a party to the contract; (3) that the interference was without justification; and (4) that the interference caused damage, *214 Corp. v. Casino Reinvestment Development Authority,* 280 N.J.Super. 624, 656 A.2d 70, 72 (1994) (citing *Norwood Easthill Associates v. Norwood Easthill Watch,* 222

N.J.Super. 378, 536 A.2d 1317 (1988)); Restatement (Second) of Torts § 766. An essential element of a cause of action for tortious interference with a contractual relationship is the requirement that the defendant's interference be malicious, which requires a showing not only that the interference was done "intentionally" but also that it was "without justification or excuse." *East Penn Sanitation, Inc. v. Grinnell Haulers, Inc.,* 294 N.J.Super. 158, 682 A.2d 1207, 1213 (1996) (citing *Printing Mart–Morristown v. Sharp Electronics Corp.,* 116 N.J. 739, 563 A.2d 31 (1989)), *cert. denied,* 148 N.J. 458, 690 A.2d 606 (N.J.1997).

■ 3. In this case, the Plaintiffs have not shown by a preponderance of the evidence that Fleming "intentionally" and "without justification or excuse" caused a breach of the valid collective bargaining agreement between the Funds and Meels. The Funds argue that Fleming caused them harm and tortiously interfered with the CBA when it "directed" Meels to cease operations.[5] However, they have not produced any probative evidence that would suggest that Fleming "directed" Meels to shut down without justification or excuse. As set forth in the findings of fact, Meels was in default of the loan documents from the time of their execution. Nonetheless, Fleming devoted significant energy to improving operations at the Pennsauken Store. The events of default increased steadily in magnitude, however, to the point where Meels was writing checks drawn on insufficient funds. At that point, Fleming determined that "[t]here was just no reason to go any further...." Findings of Fact ¶ 32. The Plaintiffs have pointed to nothing in the record to suggest that the alleged interference with the CBA was anything more than an unfortunate, but incidental, result of a valid business decision to cease operations and close a business that was no longer viable.

5. There is also nothing probative in the record to support the argument that Fleming tortiously interfered with the CBA by compelling Meels to pay Fleming before other credi-

tors. Meels' failure to pay the contributions was a symptom of the financial arrangement between Meels and Fleming.

## IV. Conclusion

1. The Plaintiff Funds have proven by clear and convincing evidence that Fleming was the alter ego of Meels. Accordingly, Fleming is liable to the Funds for Meels' delinquent contributions under ERISA § 515.

2. The Plaintiff Funds have not shown by a preponderance of the evidence that Fleming tortiously interfered with the valid CBA between the Funds and Meels in violation of Section 301 of the LMRA, 29 U.S.C. § 185(a).