**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3786-23

KUSUM FOODS, INC.,

    Plaintiff-Appellant,

v.

RAJPUT FOODS, LLC, MUKESH
KUMAR and MENKA SINGH,

    Defendants/Third-Party
    Plaintiffs-Respondents,

v.

ROBERT S. ELLENPORT, ESQ.,

    Third-Party Defendant,

and

ASHOK JAIN,

    Third-Party Defendant-
    Appellant.

_____

Submitted June 4, 2025 – Decided August 1, 2025

Before Judges Currier and Paganelli.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Docket No. L-1754-21.

Jardim, Meisner, Salmon, Sprague & Susser, PC, attorneys for appellants (Michael V. Gilberti, on the brief).

Respondents have not filed a brief.

PER CURIAM

In this action arising out of a business agreement (Agreement) between the parties, the trial court entered judgment for defendants on the counterclaim and third-party complaint for breach of contract and fraudulent inducement after a bench trial. Plaintiff and third-party defendant Ashok Jain[1] appeal from the court's June 25, 2024 denial of their motion for a new trial and judgment notwithstanding the verdict (JNOV). We affirm.

## I.

### A.

Jain is the President of Kusum Foods, Inc., (Kusum) the corporate entity which owned Bengali Sweethouse, a store and restaurant specializing in Indian delicacies. In August 2019, defendant Rajput Foods, LLC (Rajput) and Kusum entered into an Agreement under which Rajput would purchase the existing

---

[1] We refer to them collectively as plaintiffs.

A-3786-23

assets and use of name for Sweethouse from Kusum.[2]  The purchase price for the assets was $250,000.

The parties agreed to a payment schedule:  $25,000 to be paid to Kusum, "receipt of which is hereby acknowledged by Seller;" $25,000 due upon execution of the agreement; $25,000 to be paid on or before December 21, 2019; and the remaining balance of $175,000 was to be paid according to the terms and conditions of a promissory note in thirty-six equal monthly installments of $5,323.84 commencing on October 1, 2019.  The parties also executed a security agreement granting access to the collateral, which was to be listed upon a Schedule A, although no schedule was attached.  A bill of sale was supplied by Kusum for equipment, furnishings, supplies, and fixtures listed on an attached schedule.

Paragraph ten of the Agreement states:

10. Lease And Related Expenses

[Kusum] currently has a month-to-month lease for the [Sweethouse] premises . . . and is current under the terms and conditions of same.  [Kusum] agrees to sub[]lease the premises under the same terms and conditions as [Kusum's] lease for all periods of time until the Purchase Price hereunder has been paid in full, at which time the Parties agree to negotiate an extension

---

[2]  Defendant Mukesh Kumar owns 99% of Rajput; Jain owns 1%.  Defendant Menka Singh is Kumar's wife.

thereof and confirm any agreement reached in writing. Pursuant to the terms of the lease and thereby the sub[]lease, [defendants], as sub[]tenant, [are] responsible for electric, garbage and internet for the premises. Further, [defendants are] responsible for all licenses, fees and permits associated with operation of the business as a going concern regarding catering and food establishments.

Kusum executed the bill of sale for the assets on September 1, 2019. Rajput issued Kusum a promissory note in the principal amount of $175,000. Kumar and Singh executed a personal guaranty attached to the note. Rajput began operating Sweethouse that same month.

On December 9, 2020, Jain emailed defendants, stating:

> We are already in the [m]onth of December since [COVID-19] hit us. As requested by you[,] I have helped you over the last couple months with [rent] payments of $1000 instead of what was agreed upon. However[,] I can [no] longer afford this. I understand there is a pandemic and restaurants have all been affected. I have helped you a lot but now you have had a lot of time . . . to figure out how you can pay full [rent]. There are [a]lot of loans and programs offered by the government that you can look into. I will need full [rent] payments from January 2021. If not paid I will have to see what action I will have to take to protect myself. Please understand we have also been affected and I cannot keep going on with . . . $1000 per month. . . .

Later that day, defendants responded:

A-3786-23

We understand your concern but there are certain limitations that are preventing us [from paying] you.

As you know[,] due to [COVID-19], our business was running in losses and hence we applied for [a] small business loan and the same was conditionally sanctioned . . . [but] it is required [that we] present a lease agreement from the landlord at least for seven years.

The agreement which we had isn't sufficient as [a] lease . . . can you please provide us with [an o]fficial lease agreement . . . in[]accordance[,] we are planning to give you [the] entire remaining pending amount.[]

So[,] as you remember[,] you promised as part of our agreement that you will introduce us to the landlord and you will provide us with [a] ten years lease agreement signed by the landlord.

Jain responded on December 24, 2020:

[I] never promised you a new lease as part of the agreement[.]

. . . I will be very happy to negotiate the lease in your name. For this let's sit down and do a full accounting of how much . . . is owed to us. Once all outstanding money is paid[,] it will be your restaurant 100 percent.

Kumar replied on December 29, 2020:

We were being called multiple times from [b]anks to approve our loan however it's being stopped only because of [the] Agreement.

5

We have paid [over $]100K . . . already and we really need this agreement to sustain this pandemic.

As per the discussion that we had in the car parking [lot] before signing the agreement, you were to discuss [subleasing] with [the] landlord and introduce us to him.

Based on that discussion and [our] trust [in you], we signed the agreement.

Without [a] tenancy lease agreement signed by the [l]andlord [for a] minimum [of] seven years, [the] business has no value.

Can you please provide us [with a] lease agreement and introduce us to [the landlord] ASAP.

We [won't] be able to pay the remaining amount or the rent without this.

On January 15, 2021, plaintiffs notified defendants they were in default under the note and demanded they cure the default totaling $147,086, which included $138,906 in unpaid principal and accrued interest of $8,180. Additionally, the default notice stated there was a rent delinquency, excluding additional interest, of $49,087.

On January 20, plaintiffs sent an email to the landlord, Hassan Bakheet (Bakheet), which stated:

[T]o confirm our discussion on Jan[uary] 19[] in your office, . . . we hereby vacate the [Sweethouse] property . . . as of the date of this letter.

6

We will not be responsible for any dues any further. Please collect the keys from the store.

During the sixteen months defendants operated the restaurant, they paid Kusum $116,239.26 on the purchase price and $79,350 in rent.

B.

Kusum filed a complaint on May 19, 2021, alleging defendants had breached the Agreement by failing to make required payments. Kusum sought damages in the amount of $193,321, which included $138,906 in compensatory damages, $10,665 in interest, and $43,750 in attorney's fees under the promissory note.

Defendants filed an answer and counterclaim as well as a third-party claim against Jain. Defendants alleged that Jain had promised to obtain consent from Bakheet to sublet the premises to defendants so they could occupy the premises and operate Sweethouse, and Jain failed to uphold his commitment.

Defendants further alleged Bakheet would not accept monthly rent payments from defendants and notified all parties that the sublease was invalid and violated the original lease agreement between him and Jain. Defendants claimed Jain and Kusum lied, violated the Agreement, and put defendants out of business causing them severe damage as "the restaurant equipment [Kusum] sold

7

to defendants . . . had little or no value" and "[t]he value was in . . . the operating restaurant."

A bench trial was held in May 2024. Bakheet testified he had a lease agreement with Jain for the restaurant under which Jain was the tenant. The lease prohibited Jain from subletting the premises.

Bakheet stated he never approved a sublease of the property and only learned of Jain's desire to sublease the property on January 19, 2021, when he met with Jain to discuss Jain's difficulties in paying his rent obligation. Jain informed Bakheet that he could not pay the rent because defendants were occupying the space and had not paid Jain. In response, Bakheet told Jain that a sublease would not be approved, and that Jain was responsible for the rent payments as the tenant.

According to Bakheet, during the January 19 meeting, Jain stated his intention to immediately terminate his lease, and shortly thereafter, Jain emailed Bakheet stating he was surrendering the lease. Bakheet went to the premises and told defendants that plaintiffs had terminated the lease, there was no sublease, and he would be reclaiming the space and everything in it. Bakheet took control of the restaurant, and his son was running the restaurant as of the

time of trial, although they retained Singh as the manager. Bakheet sold much of the fixtures and equipment.

Kumar testified that he and Singh trusted Jain, who told them he had a good relationship with Bakheet and would get Bakheet to provide them with a lease. Kumar stated Jain did not inform defendants that his lease with Bakheet contained a no-sublease provision and had defendants known of the provision, they would not have gone forward with the Agreement.

Kumar testified that he needed to obtain a loan during the COVID-19 pandemic to meet his expenses and he wanted to pay off the promissory note so defendants could own the business. He stated that potential lenders required defendants to submit a valid sublease to obtain a loan. Kumar stated he asked Jain numerous times for a copy of his lease with Bakheet and to meet Bakheet, and Jain always replied he would give Kumar a copy of the lease and they could meet Bakheet but neither event ever occurred.

Jain testified: (1) he never discussed his lease with Bakheet with defendants until December 2020 or January 2021; (2) he never told defendants they were his subtenants; (3) he did not know why the security agreement referenced a sublease; (4) he never promised defendants he would introduce them to Bakheet; (5) Bakheet was not truthful in his testimony; (6) he had

9

authority to enter into a sublease with defendants because he had multiple conversations with Bakheet about subleasing and he had sub-tenants in the past; (7) Bakheet suggested he surrender his lease and if he did so, Bakheet would allow defendants to enter into a lease for $7,000 rent per month; (8) defendants did not sign a lease with Bakheet because he wanted a $10,000 deposit; (9) he believed either Bakheet or Singh had the restaurant equipment defendants were seeking; and (10) Kumar was lying when he testified that defendants asked Jain for a copy of the lease.

C.

On May 8, 2024, the court issued an order and written opinion, ruling in favor of defendants on their counterclaim and third-party complaint, finding Kusum and Jain to be jointly and severally liable to defendants for $116,239.26, plus attorney's fees and interest. The court also released defendants from their obligations under the note and the guarantees.

The court found all of the witnesses credible except for Jain. The court described Jain as "incredible," his testimony was "equivocal and defied common sense." The court stated Jain "presented as a person who would make representations without concern for their accuracy and without regard for the solemnity of legal form or contract." In short, the court rejected Jain's

10

testimony. The court concluded that defendants proved their claim of fraud in the inducement by clear and convincing evidence and that plaintiffs had breached the Agreement.

The court found that Jain represented to defendants that he would sublet the property to them even though he was aware his written lease with Bakheet prohibited subtenancies. The court rejected Jain's testimony that Bakheet told him he could sublet the property and determined that Jain had falsely represented, both orally and in writing, that he could sublet to induce defendants into the transaction. Therefore, the court found that Jain "preyed upon the naivete of . . . [d]efendants by concocting a story that he had a special relationship with" Bakheet to keep defendants from reaching out to Bakheet themselves. The court determined that defendants reasonably relied on Jain's material misrepresentation and incurred damages.

The court also found plaintiffs breached the contract in their inclusion of a paragraph in the Agreement that stated they would provide defendants with a sublease. The court concluded: "This [was] a materially false statement as [plaintiffs] did not have the ability to sublease the Premises."

In assessing damages, the court explained that the purchase payment of $116,239.26 flowed directly from plaintiffs' fraudulent actions and breach of

contract but determined that defendants were not entitled to the return of their rent payments of $79,350 because they were in possession of the premises and operated their business during that time.

The court also found defendants were entitled to attorney's fees under Paragraph 16.3 of the Agreement which afforded fees to a prevailing party in litigation "arising as a result of or by reason of [the] Agreement."

D.

Plaintiffs moved for a new trial and JNOV, raising two issues: (1) that the entry of the judgment against Jain individually lacked a legal basis; and (2) that the court erred in finding that the lack of a sublease caused defendants' damages when Kumar testified that the cause of their lack of revenue was the COVID-19 pandemic.

On June 25, 2024, the court denied plaintiffs' motion in a written opinion and order. The court noted there was a third-party complaint against Jain individually and plaintiffs did not move to dismiss the individual claims against Jain. Furthermore, the court determined the evidence presented during the trial established there was no distinction between Jain and Kusum, stating "Jain and Kusum . . . were essentially one and the same."

12

The court noted that, in making inducements to defendants, Jain said he personally had a lease with Bakheet and a special relationship with him. The court relied on Saltiel v. GSI Consultants, Inc., 170 N.J. 297, 303-04 (2002), and determined that Kusum was a mere alter ego of Jain, allowing the court to pierce the corporate veil under a participation theory and find Jain personally liable as he was sufficiently involved in the commission of the fraudulent conduct.

Additionally, the court found plaintiffs' contention unfounded that Kumar admitted defendants' business failed due to COVID-19. The court noted the emails sent by defendants inquiring about the sublease to obtain a loan under COVID-19 aid programs did not support plaintiffs' assertion, finding the emails were sent while the business continued to operate. Instead, the court found Jain's unilateral action in cancelling his lease was the true cause of defendants' harm as it resulted in Bakheet entering the premises, taking possession of it and its contents, and locking defendants out of the property.

The court stated that Jain did not make any efforts to preserve the contents of the lease or notify Bakheet that he defrauded defendants. Rather, he left the property and equipment to Bakheet, violating the covenant of good faith and fair dealing as his actions left defendants without a space to operate their business.

A-3786-23

II.

On appeal, plaintiffs contend the court erred in not granting a new trial and JNOV because there was no evidence to find their conduct caused defendants any damage and to find Jain individually liable.

In reviewing an appeal from a bench trial, we "give deference to the trial court that heard the witnesses, sifted the competing evidence, and made reasoned conclusions." Allstate Ins. Co. v. Northfield Med. Ctr., PC, 228 N.J. 596, 619 (2017) (quoting Griepenburg v. Twp. of Ocean, 220 N.J. 239, 254 (2015)). We do "not weigh the evidence, assess the credibility of witnesses, or make conclusions about the evidence." Mountain Hill, LLC v. Twp. of Middletown, 399 N.J. Super. 486, 498 (App. Div. 2008) (quoting State v. Barone, 147 N.J. 599, 615 (1997)). "Findings by the trial judge are considered binding on appeal when supported by adequate, substantial and credible evidence." Rova Farms Resort, Inc. v. Invs. Ins. Co., 65 N.J. 474, 484 (1974). We also defer to a trial judge's credibility determinations. In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997).

We do not accord the same deference to a trial court's interpretation of the law; our review instead is de novo. Manalapan Realty, LP v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

A.

Plaintiffs renew their argument that the court erred in finding they were the cause of defendants' damages because the evidence instead supported a determination that COVID-19 resulted in defendants' loss of revenue and resulting business failure.

As we noted, the court made detailed credibility findings regarding the witnesses, finding Jain "incredible," and rejecting his testimony. The court found defendants proved their fraudulent inducement and breach of contract claims including the proximate cause and damages elements.

To prevail on a claim of fraudulent inducement, a party must demonstrate the five elements of common-law fraud: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the [party making the representation] of its falsity; (3) an intention that the other [party] rely on it; (4) reasonable reliance thereon by the other [party]; and (5) resulting damages." Gennari v. Weichert Co. Realtors, 148 N.J. 582, 610 (1997).

The court accepted Kumar's and Bakheet's testimony as credible and found: (1) Jain represented that he either had the ability to sublet or would acquire a sublease soon after entering into the Agreement; (2) Jain knew the representation to be false due to his existing lease agreement with Bakheet; (3)

15

Jain intended defendants to rely on his representation by including a reference to the sublease in the terms of the Agreement; (4) defendants reasonably relied on Jain's misrepresentation due to Jain's assertions, his relinquishment of possession of the premises, and the collection of rent payments from defendants; and (5) defendants suffered damages when Jain surrendered the lease, causing Bakheet to take possession of the property and the equipment inside. The trial court did not err in its determinations of proximate cause and damages.

The same reasoning applies to the determination of a breach of contract. To prevail on that claim, defendants had to prove four elements:

> [F]irst, that the parties entered into a contract containing certain terms; second, that [the party making the claim] did what the contract required [that party] to do; third, that [the other party] . . . did not do what the contract required [that party] to do, defined as a breach of the contract; and fourth, that [party's] . . . breach, or failure to do what the contract required, caused a loss to the [party making the claim].
>
> [Woytas v. Greenwood Tree Experts, Inc., 237 N.J. 501, 512 (2019) (quoting Globe Motor Co. v. Igdalev, 225 N.J. 469, 482 (2016)).]

The parties do not dispute they entered into a contract. Defendants performed on the contract by making purchase payments equaling $116,239.26 and rent payments totaling $79,350 over the course of many months. The court

16

found plaintiffs breached the Agreement by failing to sublet the premises to defendants, and the failure to sublet caused defendants damages.

In specifically discussing proximate cause and damages, the court stated:

> A review of [the December 9, 2020 email,] . . . reveals that it does not say that [d]efendants' business failed due to [COVID-19]. The email was written while [d]efendants' business was still a going concern. Indeed, it reflects what caused [d]efendants[] to finally reject . . . Jain's efforts to keep them from contacting the landlord. As stated in the [emails], [d]efendants were making application for financial assistance under [COVID-19] programs and they needed a valid lease to show the agency in order to submit the application. As testified to by . . . Kumar, when the sublease was not produced by . . . Jain, [d]efendants contacted the landlord who immediately informed [them] that they were strangers to the property. The landlord then contacted . . . Jain and . . . Jain unilaterally cancelled his lease without notice to . . . [d]efendants shortly thereafter. This caused the landlord to enter the premises and take possession of same and all its contents . . . thereby locking [d]efendants out of the property and costing them the contents thereof.
>
> . . . [I]t was the actions of . . . Jain that caused harm to . . . [d]efendants.

We discern no error in the court's breach of contract analysis.

B.

We turn to plaintiffs' assertion that the court erred in finding Jain personally liable for the judgment because defendants did not seek to pierce the

corporate veil in their counterclaim against Kusum or third-party complaint against Jain.  Plaintiffs contend:  (1) Jain was not a party to the Agreement, only Kusum was; (2) Kumar testified and produced checks showing that defendants paid Kusum under the Agreement and not Jain personally; and (3) there is no evidence in the record to demonstrate that Jain "misused" Kusum or failed to observe any "corporate formality."

"[A] corporation is an entity separate from its stockholders.  In the absence of fraud or injustice, courts generally will not pierce the corporate veil to impose liability on the corporate principals."  Lyon v. Barrett, 89 N.J. 294, 300 (1982).  "Although a corporation and its stockholders are usually treated as separate entities, 'a court of equity is always concerned with substance and not merely form, and thus, it will go behind the corporate form where necessary to do justice.'"  Hartford Fire Ins. Co. v. Conestoga Title Ins. Co., 328 N.J. Super. 456, 459 (App. Div. 2000) (quoting Walensky v. Jonathan Royce Int'l, Inc., 264 N.J. Super. 276, 283 (App. Div. 1993)).

Further, a court may disregard the corporate entity to hold individual principals liable if the principals used the corporation as their alter ego and abused the corporate form to advance their personal interests.  Sean Wood, LLC v. Hegarty Grp., Inc., 422 N.J. Super. 500, 517 (App. Div. 2011).  "[W]hen the

18

corporate fiction is a mere simulacrum, an alter ego or business conduit of an individual, it may be disregarded in the interest of securing a just determination of an action." Coppa v. Tax'n Div. Dir., 8 N.J. Tax 236, 249 (Tax 1986) (quoting Iron City Sand & Gravel Div. of McDonough Co. v. W. Fork Towing Corp., 298 F. Supp. 1091, 1098-99 (N.D.W.Va. 1969)).

The party seeking to pierce the corporate veil bears the burden of proof, Richard A. Pulaski Constr. Co. v. Air Frame Hangars, Inc., 195 N.J. 457, 472 (2008), which is clear and convincing evidence. See UFCW v. Fleming Foods E., Inc., 105 F. Supp. 2d 379, 388 (D.N.J. 2000). Generally, veil-piercing is appropriate only where the corporation's principals misused the corporate entity "to perpetrate fraud, to accomplish a crime, or otherwise to evade the law." Dept. of Env't Prot. v. Ventron Corp., 94 N.J. 473, 500 (1983).

Plaintiffs' argument that it did not have notice of defendants' intent to hold Jain personally liable is disingenuous. Defendants filed a third-party complaint against Jain alleging: defendants entered into the Agreement with Jain, paid him $75,000 to transfer the business to them, and Jain unilaterally surrendered the lease to Bakheet causing defendants' damages.

As stated, the court found Jain made fraudulent misrepresentations to defendants that caused them to enter the Agreement, pay substantial amounts of

money on a note and for rent in the expectation they would become subtenants to Bakheet. After hearing the testimony, observing the witnesses and reviewing the evidence, the court found "no distinction" between Jain and Kusum. The court stated:

> [W]hen . . . Jain was making his inducements to . . . [d]efendants, he told them that 'he' had a lease with the landlord that allowed subletting and that 'he' had a special relationship with the landlord. Neither of these statements were true. However, they do show that Kusum . . . was the alter ego of Jain.

We discern no reason to disturb the court's decision concluding Jain used Kusum as his alter ego and entering judgment against Jain personally on the counterclaim and third-party complaint.

Any remaining arguments we have not addressed lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Hanley

Clerk of the Appellate Division